## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-60036-Civ-TORRES

CONSENT CASE

JAMES DORVIL,

       Plaintiff,

vs.

ADVANCE STORES COMPANY,
INC., d/b/a ADVANCE AUTO PARTS,

       Defendants.

_____/

## ORDER GRANTING DEFENDANT'S
## MOTION FOR FINAL SUMMARY JUDGMENT

This matter is before the Court on Defendant Advance Stores Company, Inc., d/b/a Advance Auto Parts' Motion for Summary Judgment with Incorporated Memorandum of Law as to Plaintiff James Dorvil's claims [D.E. 57]. The Court has reviewed the motion, response, reply, relevant authorities, supplemental filings and record evidence submitted in support for or in opposition to the motion. Based upon a thorough review of the record, we find that there are no genuine issues of material fact to preclude final summary judgment.  For the following reasons, the final summary judgment motion will be **GRANTED**.

### I.  BACKGROUND

Defendant, Advance Stores Company, Inc., d/b/a Advance Auto Parts ("Defendant" or "Advance"), employs over 51,000 people and operates 3,500 retail

locations in the United States and in the Caribbean. [D.E. 58 at 2]. In each retail location, a Store Manager supervises between ten and fifteen full-time and part-time hourly employees. [*Id.*]. Advance divides its retail locations into districts and assigns a District Manager to supervise the Store Managers within the relevant district. [*Id.*]. Asset Protection Managers further monitor Advance's retail locations by conducting announced or unannounced financial audits of the stores within the Asset Protection Manager's assigned territory. [*Id.* at 6-7]. At some of its retail locations, Advance employs an hourly Commercial Parts Professional ("Commercial Parts Pro") to make commercial sales. [D.E. 57, 58]. The Commercial Parts Pro reports to at least two supervisors within Advance's supervisory hierarchy; the Commercial Parts Pro reports to the Store Manager [D.E. 58 at 4], but the Commercial Parts Manager also retains supervisory authority over the Commercial Parts Pro. [D.E. 77 at 3]. Additionally, Advance operates a Human Resources department, equipped with an hotline that employees can call to report employer discrimination, and employs a Human Resources Manager. [D.E. 58, 77].

Plaintiff James Dorvil (Black/Haitian) began working for Advance's predecessor, Discount Auto Parts, in 1998 as a Sales Associate. [D.E. 58 at 2]. Dorvil voluntarily resigned in February 1999, but soon returned to Advance and was promoted to the Store Manager position in 2003. [*Id.*]. As a Store Manager, Dorvil's duties included supervising the store's overall operations, training, supervising, hiring and disciplining team members, ensuring customer satisfaction, maximizing profitability through sales, payroll, inventory, cost control, and complying with all company policies and

2

procedures. [*Id.*]. Dorvil received an annual salary of $41,340 in 2007 and received a pay raise on March 30, 2008 based on his performance in 2007. [*Id.* At 3]. Dorvil served Advance as a Store Manager from 2003 until his termination on April 25, 2008. [*Id.* at 2, 8].

In June 2007, Advance promoted Phil Bean (White/Caucasian) from the position of Commercial Parts Manager to the position of District Manager for district 4106. [D.E. 77 at 3]. As District Manager, Bean had supervisory authority over eleven retail locations and initially supervised five Black Store Managers, five White Store Managers, and one Hispanic Store Manager. [*Id.*]. Dorvil knew Bean when Bean served as the Commercial Parts Manager, but their professional relationship changed when Bean became Dorvil's direct supervisor following Bean's promotion to District Manager. [D.E. 77].

In October 2007, Bean hired Edgar Herrera (White/Hispanic) to replace Reinaldo Sales [Bean Depo. 11-25] as the Commercial Parts Pro in Dorvil's store. Bean hired Herrera at an hourly pay rate of $15.85, a pay rate within Advance's compensation range for the Commercial Parts Pro position, without any input from Dorvil. [D.E. 58, 57]. Bean had knowledge of Herrera's capabilities having previously supervised him in the Commercial Parts Pro position. [D.E. 58]. In directly hiring Herrera, Bean may have deviated from Advance's typical hiring procedure for the Commercial Parts Pro position. Typically, the Store Manager interviews and hires applicants for the Commercial Parts Pro position without input from the District Manager. [Bean Depo. at 32-34]. However, a Store Manager may request that the District Manager conduct

3

a follow-up interview with a prospective Commercial Parts Pro candidate. Moreover, in at least one other incident, another Store Manager hired an employee for the Commercial Parts Pro position without any input from the Store Manager. [*Id.* at 34; Bean Aff. ¶ 34].

As an hourly employee, Herrera qualified for overtime compensation. Under some circumstances, Advance's hourly employees may earn a higher annual compensation than their Store Manager because Advance's Store Managers receive salaried compensation and do not qualify for overtime pay. [Bean Aff. ¶ 33]. For instance, when Bean served Advance as a Store Manager he earned less than the Commercial Parts Pro employed at his store. [*Id.* ¶ 34].

Advance utilizes a computer-generated system for calculating each retail location's payroll hours. [Bean. Depo. at 165]. The allotment of payroll hours varies according to the store's sales figures. [*Id.*]. Under this system, the District Manager has no impact upon a store's allotment of payroll hours. [*Id.*]. In February 2008, Dorvil received a warning for exceeding the payroll hours allotted to his store. [Dorvil Depo. at 146]. However, this warning did not go into Dorvil's personnel file. [Colon Aff. ¶ 8]. Additionally, Bean issued warnings to non-Black/Non-Haitian Store Managers for payroll issues, including Ed Bila (White/American) and Gloria Duque (White/Columbian). [Bean Depo. at 240; Bean Aff. ¶ 16]. Dorvil alleges that two other Store Managers, Chase Ficarro (White/American) and Conroy Casella (White/American), also exceeded their allotment of payroll hours but did not receive warnings. [Dorvil Depo. at 52, 94, 154]. Ficarro was eventually promoted, but Bean

4

demoted Casella on August 10, 2008 for violating company policy. [Bean Aff. ¶ 23, 5; Bean Depo. at 82-83].

At the time Dorvil received a warning for exceeding his allotment of payroll hours, Herrera controlled his own schedule. [Dorvil Depo. at 61-62]. Although the Store Manager typically controls the scheduling of hourly employees, Herrera would report to work at times when he was not scheduled. [*Id.* at 62]. Additionally, Herrera would work anywhere from 10 to 25 hours of overtime without consulting Dorvil. [*Id.*]. Dorvil recognized Herrera's unchecked scheduling as a problem, and voiced the issue to Bean. [*Id.* at 62-64]. When Dorvil spoke to Bean about Herrera's practice of working unscheduled hours, Bean told Dorvil, "Don't worry about it. I will take care of it." [*Id* at 62]. Dorvil thus attributed his payroll difficulties to the unchecked behavior of Herrera. [*Id.* at 239-240].

Advance conducts a yearly Customers are Coming ("CAC") inspection of each of its retail locations to ensure that each store conforms to Advance's performance and appearance standards. [Bean Aff. ¶ 9]. Advance schedules CAC inspections far in advance, and requires a District Manager from another district to complete the inspection to prevent any possible bias. [Dorvil Depo. at 134; Bean Aff. at ¶ 10]. In the experience of District Manager Alex Galnares, a CAC inspection has never been cancelled either because of an emergency or at the request of a Store Manager. [Galnares Depo. at 30].

Galnares conducted Dorvil's February 1, 2008 CAC inspection. [Galnares Depo. at 23-24]. Dorvil requested a delay of his CAC inspection because of a sewage problem

5

with his store. [Dorvil Depo. at 135]. Although Galnares did not recall a sewage problem with Dorvil's store, a sewage issue would nevertheless fail to constitute grounds for rescheduling the CAC because Advance schedules the inspections months in advance. [Galnares Depo at 25, 30]. Dorvil's February 1, 2008 CAC inspection proceeded as scheduled, and Dorvil's store received a failing score. [Dorvil Depo. at 134-35]. Bean visited Dorvil's store on February 6, 2008 and gave him a "letter of concern" that provided Dorvil with 60 days to either correct the problems identified by the CAC review or face disciplinary action. [*Id.* at 149-50; Bean Depo. at 168-69].

Dorvil's store underwent an upgrade beginning three to four months before Dorvil's CAC inspection was scheduled. [Bean 6/22/11 Aff.¶ 4]. The upgrade took place in stages and should have been completed before Dorvil's scheduled CAC inspection in February. [*Id.*]. Another Store, managed by Casella, underwent an upgrade at a similar time, but Casella's store did not have the performance issues that Dorvil's store did. [Bean Aff. ¶ 39].

Another Store Manager in Bean's District, John Dettman (White/American), also failed the February 2008 CAC inspection. [Bean Depo. At 64-65; Bean Aff. ¶ 37]. Bean placed Dettman on probation following his failing score on the CAC inspection, but Dettman did not have any cash handling issues. [*Id.*]. Nevertheless, Advance terminated Dettman on July 18, 2008 for his poor performance and his failure to improve the overall condition of his store following his failed CAC inspection. [*Id.*]. Advance replaced Dettman with Roody Jean (Black/American). [*Id.*].

Around the same time, another Store Manager, Patrick Cheung (Asian/American), ended his employment with Advance. Asset Protection Managers Christian Taboas (White/American) and Fernando Rondinoni (White/Argentinian), and Bean conducted an investigation into Cheung's store. [Bean Depo. at 71]. The group determined that Cheung violated Advance's company policy by failing to mark-up for resale automobile parts acquired by Advance from outside sources. [*Id*. at 71-72]. Advance placed Cheung on probation because it was a Friday, but intended to call him back on Monday to affect his termination. [*Id*. at 72-73]. However, Cheung called Bean on Friday afternoon and voluntarily resigned his position. [*Id*. at 72].

On April 23, 2008, Rondinoni and Taboas conducted an unannounced financial audit of Dorvil's store. [Rondinoni Aff. ¶ 21]. Rondinoni initiated the audit because Dorvil's store consistently reported unusually low inventory shrink numbers. [Rondinoni Depo. at 38-40]. From his audit, Rondinoni concluded that Dorvil's store failed to comply with many of Advance's Minimally Acceptable Performance standards ("MAPs"). [*Id*. at 37-50]. Of more pressing concern, Rondinoni discovered that the commercial parts register at Dorvil's store was subjected to the forbidden practice of "forced balancing." [*Id*. at 51]. Forced balancing refers to the practice of treating certain dollar amounts owed to Advance by commercial customers as having been already collected. [*Id*. at 51, 60]. During the audit, Rondinoni found records, written in Herrera's handwriting on sheets of paper located next to the register, of the amounts used to forcibly balance the commercial parts register. [*Id*.]. Rondinoni concluded that

the forced balancing occurred only at the commercial parts register, and did not occur at any other registers in Dorvil's store. [*Id*. at 54].

On April 25, 2008, Rondinoni organized a meeting between himself, Bean, and Tamara Colon (White/Puerto Rican), the Human Resources Manager, to discuss the audit of Dorvil's store. [*Id*. at 54]. At that meeting, the group concluded that Herrera could not have practiced forced balancing without the knowledge or participation of the Store Manager. [*Id*. at 52]. Dorvil, as Store Manager, retained the ultimate responsibility for ensuring that each of the registers in his store balanced properly. [Dorvil Depo. at 66]. Moreover, if Dorvil believed that Bean had knowledge of forced balancing at a store within Bean's district, Dorvil was obligated to report any such misconduct on Bean's part "to R[egional] V[ice] P[resident], to H.R., do an ethic call to report this incident if it was–if he was aware and he got knowledge that there was something wrong." [Rondinoni Depo. at 65-66]. At the meeting, Bean made the decision to terminate Dorvil. [Rondinoni Depo. at 58]. Advance eventually replaced Dorvil with a Black/Nigerian manager, Olatubosun Oderino. [Bean Depo. at 75.]

Following his termination, Dorvil called Advance's hotline to complain of employer discrimination. [Dorvil Depo. at 192]. Dorvil reported that Bean made comments directed towards Dorvil based on Dorvil's race and/or national origin. Dorvil asserts that Bean mimicked his accent, saying "Oh, speak English" in a funny accent; Dorvil also asserts that Bean said "This is South Florida we do it in southern style, you've got to speak English so I can understand what you're saying," and referred to

Haitians as "you Haitians," or "you guys." It is alleged that Bean also commented that "Haitians are lazy." [*Id*. at 93, 173-74, 233].

Dorvil next filed a charge with the Equal Employment Opportunity Commission ("EEOC"). When completing the EEOC charge form, Dorvil failed to check the box labeled "national origin" and failed to specifically raise a charge of discrimination based on his Haitian background. [Dorvil Depo. at 207-08].

## II.   APPLICABLE LAW

### A.   *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers or other materials; or showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1).

However, "in determining whether summary judgment is appropriate, the facts and inferences from the facts are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine material fact and that it is entitled to judgment as a matter of law."

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As such, the court must resolve all reasonable doubts in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Gonzalez v. Lee County Hous. Auth*, 161 F.3d 1290, 1294 (11th Cir. 1998). Further, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 106 S. Ct. at 2510. Likewise, a court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Matsushita*, 475 U.S. at 592-94; *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

**B.     *Statutory Framework***

In this case, the Plaintiff's claims of race and national origin discrimination arise under the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes ("FCRA"). The FCRA is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"); therefore, federal case law dealing with Title VII applies to employment discrimination cases brought under the FCRA. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Florida Dep't of Cmty. Affairs v. Bryant*,

586 So. 2d 1205, 1208 (Fla. 1st DCA 1991). Accordingly, this Court will begin by analyzing the Plaintiff's FCRA claims of race and national origin discrimination under the framework for Title VII discrimination claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### C.   *The Burden*

In a Title VII claim, a plaintiff may establish employer discrimination by providing the Court with either direct or indirect evidence of the alleged discrimination. *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988). A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude." *Id.* "Direct evidence is that which shows an employer's discriminatory intent without any inference or presumption." *Hinson v. Clinch County*, 231 F.3d 821, 827 (11th Cir. 2000) (internal quotation marks omitted). However, "only the most blatant remarks whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Absent direct evidence of an employer's discriminatory intent, this Court recognizes a burden-shifting analysis for Title VII discrimination claims based on circumstantial evidence. *McDonnell*, 411 U.S. at 802; *See also Carter*, 870 F.2d at 582. The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* at 802. Under the *McDonnell Douglas* framework, "a plaintiff establishes a *prima facie* case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subject to adverse job action; (3) his employer

11

treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Where a plaintiff successfully establishes a *prima facie* case of discrimination, the evidence "creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason to rebut the presumption of discrimination. *Id*. "To accomplish this, the defendant must clearly set forth . . . the reasons for the plaintiff's rejection," but notably, the burden requires only production and not persuasion. *Id*.

Once a defendant produces a legitimate, nondiscriminatory reason for its action, the burden again shifts back to the plaintiff to "demonstrate that the proffered reason was not the true reason for the employment decision." *Id*. at 256. The plaintiff's burden of undermining the employer's proffered reason thus "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Id*. A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*.

However, if the plaintiff cannot identify a similarly situated employee outside of their protected class who was treated more favorably as required by *the McDonnell Douglas* framework, the plaintiff will still be able to avoid summary judgment by supplying the court with sufficient evidence to create an inference of discrimination. The inability to identify a comparator "does not necessarily doom the plaintiff's case."

*Smith v. Lockheed Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). In *Lockheed,* the court held that the *McDonnell Douglas* framework is not the only way in which a plaintiff can establish a triable issue of fact. Instead, the plaintiff can survive summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow the jury to infer discrimination." *Id .* (*quoting Silverman v. Bd. of Educ.,* 637 F.3d 729,734 (7th Cir. 2011)).

### III.   ANALYSIS

#### A.   *Plaintiff Properly Asserted a National Origin Claim*

The Plaintiff in this case properly asserted his national origin discrimination claims, contrary to Defendant's argument that Dorvil is precluded from raising a national origin claim after having failed to exhaust his administrative remedies.

There is no dispute that a federal court must enforce the "requirement of exhaustion of administrative remedies" before a plaintiff may properly assert a discrimination claim. *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985). The requirement "is satisfied when the issues (a) are expressly raised in the pleadings before the administrative agency, (b) might reasonably be expected to be considered in a diligent investigation of those expressly raised issues, or (c) were in fact considered during the investigation." *Id.*

Following the exhaustion of administrative remedies "after a party has filed a Charge with the EEOC, any subsequent judicial proceeding is limited by the nature of the Charges filed with the EEOC." *Lieberman v. Miami-Dade County*, Case No. 99-1714, 2000 WL 1717649, *4 (S.D.Fla. Aug. 16, 2000). Although "a court should apply

13

a 'liberal' standard when considering the relationship between an EEOC Charge and a judicial complaint, a claimant's lack of specificity in an EEOC Charge precludes the claimant from later seeking judicial relief." *Id.*

For example, in *Griffin,* the plaintiff's administrative complaint charged racial discrimination alleging that the post office systematically excluded qualified blacks from training, development, and opportunities for promotion within the administration. *Griffin*, 755 F.2d at 1522. The District Court dismissed the plaintiff's challenge to the post office's administration of written tests to determine candidates for advancement. The District Court concluded that the plaintiff's judicial challenge to the written tests fell outside of the scope of "the administrative investigation which could be reasonably expected to grow out of the charge of discrimination." *Id.* However, the Eleventh Circuit reversed the order and remanded for consideration of the claim. The Eleventh Circuit reasoned that "written examinations were an integral part of the promotional scheme" and held that "[plaintiff's] complaint clearly challenged aspects of defendant's employment practices which would reasonably include testing." *Id.*

Also, the Fifth Circuit has held that technical defects, such as failure to check a box on a form, will not automatically bar a plaintiff's discrimination claim. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). In *Sanchez,* the plaintiff filed a charge of discrimination with the EEOC by completing a Charge form. The form "calls for the complainant to specify whether the discrimination alleged was 'because of' (a) 'race or color,' (b) 'religious creed,' (c) 'national origin' or (d) 'sex'; a row of boxes is provided- one for each category of discrimination.). *Id.* at 458.  The complainant

checked only the box labeled "sex." *Id.* The complainant later amended her charge of discrimination and checked the boxes labeled "sex" and "national origin." *Id.* However, the plaintiff amended her complaint after the ninety-day period allowed for such amendments. *Id.* Nevertheless, the Fifth Circuit concluded that the "[plaintiff's] failure to check the box labeled 'national origin' was a mere 'technical defect or omission'" and would not bar the plaintiff from presenting the claim of national origin discrimination to the Court. *Id.* at 462. The Fifth Circuit reasoned that "the provisions of Title VII were not designed for the sophisticated or the cognoscenti, but to protect equality of opportunity among all employees and prospective employees." *Id.* at 463.

Notably, the Court identified three reasons why a charging party might fail to check the correct box on the EEOC charge form: (1) the charging party may be unaware of the employer's motivation for perpetrating the "unfair thing" done to him, (2) the charging party may not understand the distinction between an act motivated by different kinds of discrimination, and (3) the charging party may be unschooled in the use of forms. *Id.* at 462-63. The Court explained that none of the aforementioned reasons "should cut off the charging party's rights." *Id.* at 462.

In the present case, like the plaintiff in *Sanchez*, Dorvil failed to check the box labeled "national origin" on the EEOC Charge form, and only checked the box labeled "race." [Dorvil Depo. at 208]. In response to the EEOC Charge form's prompt to provide a description of the discrimination, Dorvil wrote: "I was terminated because the DM disliked my race." [*Id.* at 208 and Exh. "15" thereto]. However, in his deposition, Dorvil notes that "English is my second language" [*Id.*. at 209], and reveals his confusion

about the exact basis for the discrimination stating that, in his perception, "black race. It's the same thing. Haitian black." [*Id.* at 207].

Moreover, Dorvil did include the word "Haitian" on his EEOC Charge form. Dorvil wrote on the form that "Mr. Bean also addressed Black and Haitian employees as 'you guys," and 'you Haitians,' he stated on numerous occasions that 'Haitians are lazy,' he mimic the accent and tell people to 'speak English.'" [Dorvil Depo. at 231].

This Court must employ liberal standards in determining the relationship between the EEOC Charge and the plaintiff's later judicial complaint. As the court indicated in *Sanchez*, it is entirely probable that Dorvil was unaware of the distinction between acts motivated by different kinds of discrimination. In fact, Dorvil's statements indicate that he doesn't perceive a difference between being Haitian and being Black. Additionally, similar to *Griffin*, in which the plaintiff's reference to the exclusion of Blacks from training and promotion could reasonably be expected to include an investigation into the written tests used to determine promotions, an investigation into national origin discrimination could reasonably be expected to be executed when Dorvil's EEOC Charge directly referenced race but also included allegations of discriminatory remarks made about his national origin.

Therefore, Dorvil adequately asserted his claims of national origin discrimination in his EEOC Charge, and the Court is entitled to address these claims here.

### B. *Plaintiff's Prima Facie Case*

Dorvil clearly meets the requirements for the first and fourth prongs of the *McDonnell Douglas* test to establish a *prima facie* case of discrimination based on race and/or national origin: (1) Dorvil is a member of a protected class as he is Black and is of Haitian national origin; and (4) Dorvil was qualified for his position. The Defendant does not contest the first and fourth prongs of the *prima facie* case, and the Court will accordingly limit discussion to the second and third prongs of the *McDonnell Douglas* test.

### 1. *Plaintiff's Termination Constitutes an Adverse Employment Action For Purposes of the Prima Facie Case*

The second prong of the *McDonnell Douglas* test requires that the plaintiff suffer an adverse job action to establish a *prima facie* case of discrimination. *Holifield*, 115 F.3d at 1562. Although Dorvil makes several allegations that Defendant's discrimination resulted in adverse job actions, only Dorvil's eventual termination constitutes an adverse job action for the purposes of the *McDonnell Douglas* test and the establishment of his *prima facie* case.

First, "not all conduct by an employer negatively affecting an employee constitutes an adverse employment action" for the purposes of establishing a *prima facie* case of discrimination. *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1238 (11th Cir. 2001). For a plaintiff to establish a *prima facie* case of discrimination, and to then succeed on discrimination claim, an employee must show that the employment decision seriously and materially affected the terms of her employment. *Id.* at 1239.

17

Second, if the employer's alleged discriminatory action falls short of an ultimate employment decision, the conduct must substantially "alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (internal quotation marks omitted). As such, if a plaintiff alleges discrimination with regards to an employment decision that falls short of termination, the Eleventh Circuit requires an employee to "demonstrate she suffered a *serious and material* change in the terms, conditions, or privileges of employment to show an adverse employment action." *Id.* at 971.

The Defendant's actions in February 2008 fail to constitute an adverse job action for the purposes of the *prima facie* case. In February 2008, Dorvil exceeded his allotted payroll hours. In response to this infraction, Dorvil received a warning; however, the Defendant did not save the warning in Dorvil's personnel file. Dorvil argues that evidence that three Black Store Managers received similar warnings, including plaintiffs Dorvil, St. Georges, and Ganpath, while only two White Store Managers received such warnings demonstrates that Bean targeted Black Store Managers. This showing of evidence is insufficient as a matter of law given that the Defendant employs a computer-generated system for determining payroll hour allocations and given the statistical insignificance between the numbers two and three.

Similarly, the Defendant's actions in allowing Bean to hire Herrera as the Commercial Parts Pro and in allowing Bean to supervise Herrera does not constitute an adverse employment action for the purposes of the *prima facie* case. Dorvil claims

18

that the Defendant discriminated against him when Bean hired Herrera to work as the Commercial Parts Pro in Dorvil's store. Dorvil also claims that the Defendant discriminated against him because Bean supervised Herrera while Herrera worked in Dorvil's store. This Court is not persuaded that Defendant's actions in hiring and supervising Herrera constituted adverse employment actions for the purposes of the *prima facie* case. This employment decision falls short of an ultimate employment decision. Even if the Defendant's actions modified Dorvil's duties in some way, the evidence does not suggest that the Defendant's actions *significantly* altered the terms, conditions, or privileges of Dorvil's employment. Moreover, even if the Defendant's actions in hiring and supervising Herrera suggest that the Defendant deviated from the Defendant's typical hiring procedures, on at least one other occasion a District Manager directly hired a Commercial Parts Pro for Bean's store.

In addition, the Defendant's actions in failing to reschedule Dorvil's CAC inspection in light of a sewage problem with Dorvil's store does not constitute an adverse employment action for the purposes of the *prima facie* case. Dorvil claims that the Defendant discriminated against him because the Defendant did not accommodate Dorvil's request to reschedule his annual CAC inspection. The Defendant's refusal to reschedule the CAC inspection falls short of an ultimate employment decision. Moreover, the Defendant's refusal to reschedule the CAC inspection in does not amount to a "*serious and material* change in the terms, conditions, or privileges of employment to show an adverse employment action." *Crawford*, 529 F.3d at 971. In fact, the yearly CAC inspection is one of the Store Manager's critical duties, is scheduled far in

advance and around the same time each year, and is rescheduled only in the event of an emergency. Additionally, senior management stated that a sewage problem would not constitute grounds for rescheduling the CAC. Thus, the Defendant's decision to move forward with the CAC inspection despite the sewage problem does not rise to the level of an adverse employment action.

Finally, the Defendant's actions in moving forward with the CAC even though Dorvil's store was being upgraded and in failing to provide Dorvil assistance with his store's upgrade while providing assistance to another Store Manager undergoing an upgrade does not constitute an adverse employment action for the purposes of the *prima facie* case. The Defendant's actions regarding the store upgrade do not rise to the level of an ultimate employment decision. Moreover, the upgrade of Dorvil's store began three to four months before the CAC, took place in stages, and should have been completed prior to the CAC. Drawing all reasonable inferences in the Plaintiff's favor, the upgrade of Dorvil's store and the assistance given by the Defendant to Casella fail to constitute an adverse employment action because these decisions do not seriously and materially affect Dorvil's terms, conditions, and privileges of employment.

Only the Defendant's eventual termination of Dorvil constitutes an adverse employment action for the purposes of the *prima facie* case. Unquestionably, the termination seriously and materially altered Dorvil's terms, conditions, and privileges of employment. Thus, at least with respect to his termination, Dorvil satisfies the second prong of the *McDonnell Douglas* framework for the purposes of establishing a *prima facie* case of discrimination.

20

## 2.     *Plaintiff Failed to Identify a Similarly Situated Employee Outside his Class that the Defendant Treated More Favorably*

The third prong of the *McDonnell Douglas* framework requires that the plaintiff identify a similarly situated employee outside of the plaintiff's protected class that the employer treated more favorably. *Holifield*, 115 F.3d at 1562. Although Dorvil tries in vain to identify a similarly situated comparator outside of his protected class, as a matter of law Dorvil fails to identify such a similarly situated employee for the purpose of establishing his *prima facie* case.

In order to satisfy the third prong of the *McDonnell Douglas* framework and to establish a *prima facie* case, the comparator's conduct must be nearly identical to the plaintiff's conduct in all relevant aspects to prevent the Court from second-guessing the wisdom of an employer's legitimate business decision. *E.g., Jiles v. United Parcel Serv., Inc.,* 360 F. App'x. 61, 65 (11th Cir. 2010). When comparing the conduct of the plaintiff with the alleged similarly situated individual, the court must consider the nature of the offenses committed and the nature of the punishment imposed on each of the employees. *Marshall v. Mayor & Alderman of City of Savannah, Ga.*, 366 F. App'x 91, 98 (11th Cir. 2010) (finding that a female firefighter failed to identify any other employee that had engaged in the same behavior and thus failed to demonstrate any disparate punishment).

Hence, in determining whether employees are similarly situated in cases involving allegedly discriminatory discipline, the Court evaluates "whether the employees [were] involved in or accused of the same or similar conduct and [were]

disciplined in different ways." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted). The "quantity and quality" of the comparator's misconduct must be "nearly identical" to the plaintiff's misconduct, in order "to prevent courts from second-guessing employers' reasonable decisions." *Id.* (citation omitted). Courts in this district have found that similarly situated employees "must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating conduct that would distinguish their conduct or the appropriate discipline for it." *Cabrera v. LaHood,* 2011 WL 2600705, *8 (S.D. Fla. June 29, 2011) (quoting *Mazzella v. RCA Global Commc'ns, Inc.,* 642 F. Supp. 1531, 1547 (S.D.N.Y.1986)); *see also Sanguinetti v. United Parcel Serv., Inc.,* 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000).

Dorvil fails to identify a comparator that is similarly situated to himself in all material aspects. To satisfy the similarly situated prong, Dorvil must identify a Store Manager outside of his protected class who committed infractions identical to those committed by Dorvil and yet received disparate punishment. More specifically, Dorvil must identify a non-Black/non-Haitian Store Manager who engaged in the forced balancing of the commercial parts register and who was not then terminated by the Defendant for those infractions of company policy.

Dorvil's first proposed comparator, Store Manager John Dettman, fails to establish the third prong of Dorvil's *prima facie* case because Dettman was not similarly situated to Dorvil in all relevant aspects. Like with Dorvil, the Defendant

placed Dettman on probation after Dettman failed his February 2008 CAC inspection. The Defendant eventually terminated Dettman on July 18, 2008 for his poor performance and inability to improve the condition of his store. Although Dettman's termination occurred some months after Dorvil's termination, Dettman's store did not have the forced balancing issues that Rondinoni discovered at Dorvil's store. Because the nature of the offenses committed by Dorvil and Dettman were not identical, Dettman cannot be an adequate comparator to generate an inference of discrimination as required by the *McDonnell Douglas* framework.

Dorvil's second proposed comparator, Store Manager Conroy Casella, also fails to establish the third prong of Dorvil's *prima facie* case because Casella was not similarly situated to Dorvil in all relevant aspects. The Defendant demoted Casella on August 10, 2008 for violating Advance's company policies regarding sick time. Although the Defendant demoted Casella while the Defendant terminated Dorvil, Casella's store did not have the forced balancing issues that Rondinoni discovered at Dorvil's store. The nature of the offense committed by Casella was different than the offense by Dorvil, which also prohibits Casella from being a similarly situated employee for the purposes of establishing Dorvil's *prima facie* case.

Dorvil's third proposed comparator, Store Manager Patrick Cheung, also fails to establish the third prong of Dorvil's *prima facie* case because Cheung was not similarly situated to Dorvil in all relevant aspects. The Defendant suspended Cheung for violating the Defendant's store policy regarding the mark-up percentages required by the Defendant for resale on parts bought by the Defendant from outside sources.

Cheung was suspended and not immediately demoted because the investigation and deliberations concluded on a Friday and the Defendant's upper management preferred to call him on a Monday to effect the termination. However, Cheung then called Bean and quit his position with the Defendant. Again, the nature of the offenses committed by Dorvil and Cheung differed, and Dorvil is ultimately unable to identify a comparator suitable for purposes of the *McDonnell Douglas* framework.

Having been unable to satisfy this critical third prong of that framework, Dorvil as a matter of law fails to establish a prima face case of discrimination.  And having failed to proffer any evidence of direct evidence of racial or national origin discrimination, Dorvil's claim cannot survive on summary judgment.

### C.   *If Plaintiff Had Established a Prima Facie Case, the Defendant Proffered a Legitimate, Nondiscriminatory Reason for its Employment Decision That Has Not Been Shown to Be Pretextual*

Even if the Plaintiff was able to establish a *prima facie* case of discrimination, the Defendant proffers a legitimate, nondiscriminatory reason for auditing Dorvil's store and for effecting Dorvil's termination. Rondinoni, the Asset Protection Manager responsible for Bean's district and Dorvil's store, conducts a financial or inventory audit of a store when he observes a "red flag." There is no factual dispute that the audit of Dorvil's store was triggered by a financial metric – the unusually low inventory shrinkage.  Bean did not request that Rondinoni audit Dorvil's store, and Bean was not present for the audit of Dorvil's store. Rondinoni, who has not been accused of harboring discriminatory animus, conducted the audit to fulfill his responsibilities as an Asset Protection Manager and to protect Advance's financial well-being.

Similarly, the Defendant terminated Dorvil and did not consider any other forms of discipline because of the seriousness of the forced balancing issue at Dorvil's store. The Defendant made a business decision to terminate a Store Manager who neglected his responsibilities as Store Manager and thus proved ineffective in that position. Because the *McDonnell Douglas* framework requires only production of a legitimate, non-discriminatory reason for its employment decision, the Defendant has clearly satisfied this burden.

The burden then shifts to Dorvil, who must offer evidence demonstrating that the reason given for his termination was merely pretext for discrimination. Under the *McDonnell Douglas* framework, an employee retains the ultimate burden of persuading the court by a preponderance of the evidence of an employer's intentionally discriminatory conduct. *Tex. Dept. Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Dorvil must provide probative circumstantial evidence to prove the pretextual nature of Advance's employment action by "discredit[ing] in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997). However, where an employer offers objective evidence supporting its explanation, an employee's submissions of conclusory allegations do not and cannot establish pretext. *Young*, 840 F.2d at 830.

Dorvil does not establish that the reasons proffered by the Defendant merely represent pretext for discrimination. Dorvil attempts to argue that inconsistent testimony regarding the impetus for the financial audit of his store establish that his

termination was a pretext for discrimination. However, the fact remains undisputed that under Dorvil's watch amounts owed to the store were permitted to be calculated as if already paid. The practice of forced balancing clearly violated Advance's store policy, and Dorvil fails to offer the Court any convincing arguments as to why his termination should more properly be construed as the result of discrimination rather than the result of his violation of company policy. A reasonable juror could not find otherwise on this record, therefore Dorvil's ultimate burden of demonstrating discriminatory intent cannot be satisfied as a matter of law.

We add that Dorvil's contrary and sincere belief that discrimination occurred does not alter the result under Eleventh Circuit law. Dorvil's "opinion [that he was discriminated against], without more, is not enough to establish a prima facie case of race discrimination." *Holifield,* 115 F.3d at 1564; *see also Mack v. St. Mobile Aerospace Engineering, Inc.*, 195 F. App'x. 829, 844 (11th Cir. 2007). Indeed, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010). And because Defendant has the "right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY Radio / Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984), while its decision to terminate Dorvil may have been harsh and even erroneous there is insufficient credible evidence from which a jury can infer that it was discriminatory. *See id.*

### D.      There is no Other Evidence Sufficient
to Create an Inference of Discrimination

"Establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," *Smith,* 644 F.3d at 1328. Therefore, Dorvil can still establish a triable issue of fact by presenting the court with other evidence sufficient to create an inference of discrimination even though he fails to establish the existence of a similarly situated comparator. However, Dorvil failed to present the "convincing mosaic of evidence" that *Lockheed* requires in order to avoid summary judgment. *Id.*

Dorvil argues that an inference of discrimination is created by the fact that Bean must have known that Herrera forcibly balanced the commercial parts register at Dorvil's store. However, Dorvil admits that, as Store Manager, the Defendant charged him with enforcing all company regulations and ensuring the compliance of all subordinate employees with company regulations. As such, Dorvil had the ultimate responsibility of ensuring that the commercial parts register was properly balanced.

Dorvil acknowledges this responsibility, but argues that he informed Bean of the illegal practice and that Bean failed to correct the problem. However, if the problem remained after Dorvil notified Bean, the Defendant's company policy required Dorvil to continue notifying superiors up the chain of command until someone rectified the problem. To satisfy Dorvil's ultimate responsibility as a Store Manager, Dorvil should have continued addressing the problem until his store's cash handling complied with

the Defendant's policy. Because Dorvil's attempt to address the forced balancing issue failed to satisfy his ultimate responsibility as a Store Manager, the Defendant had sufficient grounds for termination.

Thus, drawing all reasonable inferences in the light most favorable to the Plaintiff, and assuming that Bean knew that Herrera forcibly balanced the commercial parts register at Dorvil's store, Dorvil's evidence still fails to create an inference of discrimination.

Additionally, Dorvil argues that certain comments made by Bean to Dorvil create an inference of discrimination. Dorvil claims that Bean mimicked his accent, saying, "Oh, speak English" in a funny accent, and, "This is South Florida we do it in southern style, you've got to speak English so I can understand what you're saying." Additionally, Bean allegedly referred to Haitians as "you Haitians," or "you guys." Dorvil also claims that Bean said, "go, whitey, go," and commented that "Haitians are lazy." However, not every comment addressing a plaintiff's protected characteristics create an inference of discrimination. *Young v. Gen. Foods Corp.,* 840 F.2d 825, 829 (11th Cir. 1988). Here, the relationship between Bean's comments and Dorvil's termination is simply too attenuated to establish an inference of discrimination.

Finally, Dorvil argues that the fact that Colon, who was responsible for overseeing the handling of Dorvil's hotline complaint, was a part of the decision to terminate him suggests that Advance does not take EEO complaints seriously. However, this argument is not convincing. The audit of Dorvil's store was initiated by Rondonini based on a financial metric, and the ultimate decision to release Dorvil was

made by Bean. The fact that the Human Resources Manager was notified and consulted prior to the termination does not create an inference of discrimination, even if the individual involved had knowledge of Dorvil's claims of discriminatory treatment.

The evidence presented to the Court regarding Bean's knowledge of the forced balancing, his isolated and stray comments, and Colon's involvement in the termination decision falls short of creating a "convincing mosaic of circumstantial evidence" sufficient to establish an inference of discrimination, especially in light of the fact that Dorvil was replaced by a Black manager of Nigerian national origin.

In *Smith* the Eleventh Circuit found that a convincing mosaic of evidence was created based on (1) the backdrop of racial tension in the company following a workplace shooting, (2) a listing of employees by name and race created for use while making disciplinary decisions, and (3) an upcoming news program portraying Lockheed's struggles with racism in an unflattering light. Here, by contrast, the evidence presented by Dorvil cannot compare to the substantial discriminatory record present in *Lockheed* and, fails to create an inference of discrimination sufficient to survive summary judgment.

The Court, therefore, is left with little choice but to grant summary judgment on this record in favor of Defendant. The Court considered Dorvil's claims, in particular, to be quite close to the line where a jury trial was necessary for proper resolution. That is especially so given the inconsistency between Bean's treatment of Herrera, his friend whom he hired, with Dorvil in relation to the same mishandling of the commercial parts register. But the Court's judgment that this inconsistency was

wrong does not mean that it was discriminatory based on race or national origin, particularly in light of the fact that Bean was not the only decisionmaker.  The evidence of discrimination is simply lacking, as a matter of law, under the authority that this Court must apply in this Circuit.

### IV.   CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** that Defendant Advance Stores Company, Inc. d/b/a Advance Auto Parts' Final Summary Judgment Motion [D.E. 57] is **GRANTED**.  Judgment shall be entered by separate Order in favor of Defendant and against Plaintiff James Dorvil.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of December, 2011.

       /s/    *Edwin G. Torres*       
EDWIN G. TORRES
United States Magistrate Judge